J-S20024-23

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT OP 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| DAVID C. HOFMANN | : | |
| | : | |
| Appellant | : | No. 2346 EDA 2022 |

Appeal from the Judgment of Sentence Entered April 25, 2022,
in the Court of Common Pleas of Bucks County,
Criminal Division at No(s):  CP-09-CR-0004018-2020.

BEFORE:   DUBOW, J., KUNSELMAN, J., and COLINS, J.[*]

MEMORANDUM BY KUNSELMAN, J.:          **FILED SEPTEMBER 21, 2023**

David C. Hofmann appeals from the judgment of sentence imposed after a jury found him guilty of multiple sex offenses against a minor.  Upon review, we affirm.

The trial court detailed the evidence as follows:

This case arises from [Hofmann], blatantly, repeatedly, and continuously, sexually assaulting a [male] minor, D.S. from on or around June 1, 1995 until approximately February 28, 2007. [Hofmann] was a friend of D.S.'s parents, initially meeting them at some point in 1994.  [Hofmann], a friend of D.S.'s father, would continually come over to their house and do various odd jobs. D.S.'s mother described [Hofmann's] presence as "He ... just always seemed to be there."

When [Hofmann] would visit the family, he would often stay over, sleeping in a sleeping bag on the floor of D.S.'s bedroom while D.S. slept in a bunkbed.  [Hofmann] started sleeping in D.S.'s bedroom sometime in 1996 or 1997.  Around 1998, D.S.'s older

_____

[*] Retired Senior Judge assigned to the Superior Court.

cousin moved in with the family due to the death of her mother, D.S.'s aunt. The older cousin would then sleep in the top bunk of the bunk bed, D.S. in the lower bunk, and [Hofmann] on the floor. [Hofmann] portrayed himself as a friend to the family, buying D.S. and his siblings' gifts, spending holidays and going on vacations with D.S.'s family. Most of [Hofmann's] attention and gifts were focused on D.S.

However, rather than being a simple family friend, "Uncle Dave" commenced an aggressive course of sexually assaultive predatory conduct of D.S, at every opportunity. ("Whenever we were alone it happened."). D.S. was approximately six years old the first time [Hofmann] had sexual contact with him. As [Hofmann] began to sexually assault D.S. when he was very young, did so repeatedly, and for a long time, D.S. was not able to identify the exact first time it happened. However, D.S. was able to identify the period when the abuse started, as D.S. recalled it occurring after [Hofmann] carried a then six-year-old D.S. back home after D.S. was hit in the face with an aluminum T-Ball bat. [Hofmann] would be around D.S.'s family "almost every weekend" and "almost... every time [he] was around, it almost happened every time."

\*\*\*

By 2007, the [then] seventeen-year-old D.S. was sharing his bedroom with his fourteen[-]year[-]old sister. When D.S.'s mother was cleaning his bedroom in late January or early February 2007, she found a used condom in the trash. D.S's parents initially confronted the younger sister, who denied all knowledge of the condom. When they spoke to D.S., however, he explained that the condom was from him, and disclosed that he had been sexually assaulted for over a decade by [Hofmann]. Although D.S.'s mother had expressed suspicions about [Hofmann] previously, this was the first time D.S. had told anyone what [Hofmann] had done to him. D.S. was overwhelmed while telling his parents what had happened — D.S. was scared, confused, and crying.

After D.S.'s disclosure, D.S.'s parents decided to confront [Hofmann] about what they had learned. In doing so, they made sure to record their conversation with him. The video was filmed in their kitchen with a "very big camera." During the video, [Hofmann] admit[ted] to D.S.'s parents what he had done to their child. Even after admitting his crimes in the video, [Hofmann]

almost immediately deflect[ed] any responsibility for his actions and instead [began] to reference sexual abuse that [he] had undergone when he was a minor. Despite making the video, D.S.'s parents did not reach out to the police. D.S.'s parents believed that D.S, was terrified of the police and just wanted to move on. D.S. stated at least part of his fear was that [Hofmann] had told D.S. that if he said anything, [Hofmann] would get in trouble.

Years later and now with children of his own, D.S. decided he could no longer "keep living a lie" and approached the police in early 2020. Only after D.S. decided to contact the police in 2020, did his mother speak to them about what [Hofmann] had done to her child. D.S. had not seen nor had any contact with [Hofmann] since D.S. told his parents about [Hofmann] in 2007. Arrangements for D.S. to speak with the police were made by the Network of Victims Assistance ("NOVA"), Bucks County's victim advocacy agency. D.S. came to the police station with his wife, his mother, one of his sisters, and a NOVA representative. D.S. initially spoke with Sergeant Christopher Clark of the Falls Township Police Department, who conducted a minimal fact interview. After the minimal fact interview, Sergeant Clark contacted Detective Steven Reeves, also of the Falls Township Police Department to take over the investigation. Detective Reeves conducted a more extensive interview of D.S. When being interviewed by Detective Reeves, D.S. physically shook, his voice quavered, and he appeared scared.

Ultimately, D.S. agreed to a consensual electronic intercept of calls made between himself and [Hofmann]. Detective Reeves, along with Detective Robert Gorman of the Bucks County District Attorney's Office at County Detectives, first attempted to call [Hofmann] in February of 2020. The calls were unsuccessful, and eventually D.S. reconsented to the interception, and attempts at calling [Hofmann] resumed on June 8th, 2020. Calls to [Hofmann's] cell phone and home were both unsuccessful, and eventually the tactic was changed and they decided to have D.S. leave a voicemail on [Hofmann] device. "A few seconds" after D.S. had left a voicemail, he received an incoming call from [Hofmann]. Although the police were unable to do their standard prefatory actions, they told D.S. to answer to not miss the opportunity.

During the phone call, D.S. stated that he needed to talk with [him] as there were "things I want to get off my chest" and he

"can't move on . . . ." As in the 2007 video recording, [Hofmann] once again admit[ted] to what he had done to D.S. After [Hofmann] asked D.S. to clarify what "messed him up," when D.S. said "the sex, and . . ." [Hofmann] remarked, "But you liked that at the time" before chuckling. [Hofmann] also admitted to his attempts to anally penetrate D.S. [Hofmann] also specifically discussed when he sexually assaulted D.S. in the pool. When D.S. suggested that he was five or six years old during at least some of the assaults, [Hofmann] agreed. At one point in the call, [Hofmann] corrected D.S. that rather than being seven years old during one of the incidents, he was rather nine, about to turn ten years old. [Hofmann] also suggested multiple times that D.S. could "come over" and appear[ed] to have been suggesting that they resume sexual relations.

Trial Court Opinion, 1/20/23, at 1-6.

Hofmann was ultimately arrested in June 2020. He was charged with rape of a child, involuntary deviate sexual intercourse with a child, involuntary deviate sexual intercourse with a person less than sixteen years of age, statutory sexual assault, corruption of minors, indecent assault of a person less than thirteen years of age, indecent assault of a person less than sixteen years of age.[1] Following trial, a jury convicted Hofmann of all charges.

Due to the nature of his convictions, Hofmann was subsequently assessed by the Sex Offenders Assessment Board ("SOAB") in order to determine if he qualified as a Sexually Violent Predator ("SVP"). An SVP hearing was held on April 25, 2022. An expert testified that Hofmann met the criteria of an SVP. As a result, the trial court determined that Hofmann was

_____

[1] 18 Pa.C.S.A. §§ 3121(c), 3123(b), 3123(a)(7), 3122.1, 6301(a)(1), 3126(a)(7), 3126(a)(8), and 3123(a)(7).

- 4 -

an SVP. The court then sentenced Hofmann to 25 to 50 years' incarceration. Hofmann filed a post-sentence motion, which the court denied.

Hofmann filed this timely appeal. Hofmann and the trial court complied with Pennsylvania Rule of Appellate Procedure 1925.

Hofmann raises the following four issues for our review, which we have reordered for ease of disposition:

A. [Did] the trial court [err] in admitting a photograph of the complaining witness as a child?

B. Did the trial court err permitting detective Gorman to testify regarding the reason for consensual interceptions [of phone calls]?

C. Did the Commonwealth fail to establish by clear and convincing evidence that [Hofmann] meets the statutory criteria for designation as a sexually violent predator?

D. Did the trial court abuse its discretion in sentencing [Hofmann] by failing to consider all relevant factors, by imposing a manifestly excessive sentence, and by relying solely on the nature of the offense and other improper factors?

*See* Hoffman's Brief at 9.

**A.**

In his first and second issues, Hofmann claims that the trial court erred in making certain evidentiary rulings. Our standard of review regarding evidentiary issues is well settled. "The admissibility of evidence is at the discretion of the trial court and only a showing of an abuse of that discretion, and resulting prejudice, constitutes reversible error." *Commonwealth v. Sanchez*, 36 A.3d 24, 48 (Pa. 2011) (citations omitted). "To constitute reversible error, an evidentiary ruling must not only be erroneous, but also

harmful or prejudicial to the complaining party." ***Commonwealth v. Lopez***, 57 A.3d 74, 81 (Pa. Super. 2012) (citation omitted).

In determining whether evidence should be admitted, the trial court must weigh the relevant and probative value of the evidence against the prejudicial impact of that evidence. Evidence is relevant if it logically tends to establish a material fact in the case or tends to support a reasonable inference regarding a material fact. ***Commonwealth v. Storey***, 167 A.3d 750, 758 (Pa. Super. 2017) (citation omitted); Pa.R.E.401. Although a court may find that evidence is relevant, the court may nevertheless conclude that such evidence is inadmissible due to its prejudicial impact. ***Id.***; Pa.R.E. 403.

Furthermore, even if a trial court erroneously admitted evidence, the error may be considered harmless. "Harmless error exists if the record demonstrates [that] ... the error did not prejudice the defendant or the prejudice was *de minimis* . . . ." ***Commonwealth v. Hairston***, 84 A.3d 657, 671 (Pa. 2014) (citations and quotation marks omitted). "An error may be deemed harmless . . . where the properly admitted and uncontradicted evidence of guilt was so overwhelming and the prejudicial effect of the error was so insignificant by comparison that the error could not have contributed to the verdict." ***Commonwealth v. Moore***, 937 A.2d 1062, 1073 (Pa. 2007).

Hofmann first claims that the court erred in allowing the Commonwealth to introduce a photograph of D.S. when he was 8 years old. Hofmann maintains that the photograph was highly inflammatory, and any probative value was clearly outweighed by the prejudice. According to Hofmann,

because he did not contest that D.S. was a child at the time of the alleged offenses, the photograph was irrelevant and inadmissible, citing *Commonwealth v. Vucich*, 194 A.3d 1103 (Pa. Super. 2018). Hofmann further maintains that the court's erroneous admission of the picture was not harmless. Hofmann's Brief at 11, 34, 37. We agree the photograph was irrelevant and inadmissible, but we conclude that its admission was harmless.

At trial, the Commonwealth sought to introduce three photographs of D.S. at ages 7, 8, and 10, for the purpose of establishing D.S.'s age at the time of the assaults, which was an element of several of the offenses. The Commonwealth also sought to introduce the photographs to rebut Hofmann's attack on D.S.'s credibility. Hofmann objected. The trial court overruled the objection, in part, and allowed only the photograph of D.S. at age 8 to be admitted into evidence.

Regarding the admission of photographic evidence, as with other types of evidence, "[t]he determinative inquiry is whether the photos have evidentiary value that outweighs the possibility of inflaming the minds and passions of the jurors." *Commonwealth v. Jacobs*, 639 A.2d 786, 788 (Pa. 1994). Here, the trial court conducted the requisite analysis and concluded that the one photograph was probative and any prejudice *de minimis*.

In ruling on the admission of the photographs, the trial court noted that one picture was sufficient, instead of all three. The court reasoned that the photograph it allowed was a "school photograph which would have been posed just for school like every other kid in America . . . back then." N.T., 12/7/21,

- 7 -

at 71. The photograph did not reveal or interject anything else about D.S.'s life, personality, or interests like the other two photographs. The court further stated:

> I find that it has absolute probative value. This jury needs to know, being asked to guess and things of that nature. As I've said, the age issues are smack-dab in [the middle of] this case and I think it's fair. And to only introduce one versus three is also more fair to Mr. Hofmann . . . . [T]o the extent there's some prejudice from a photograph of a young child and it might engender some sympathy from a jury, I recognize that could happen[,] but it's far outweighed by the idea that this jury needs a picture in their brain of what [D.S.] looked like 20 some years ago.

*Id.* at 72.

The court further explained that the photograph helped "anchor D.S.'s statements around a certain time period" given that the assaults happened over a long period of time. It also helped to establish the age of D.S. at the time of the offenses, one of the elements at issue. The photograph was not the sort of depiction that would generate an inflammatory emotional response from the jury. Trial Court Opinion, 1/20/23 at 13. As such, the photograph was not more prejudicial than probative and therefore was admissible.

Hofmann's argument that **Vucich** renders the photograph of him as a child irrelevant and inadmissible is correct. In **Vucich**, the Commonwealth sought to introduce two photographs of the victim when he was between 9 and 11 years old when the sexual abuse occurred. The Commonwealth felt this was necessary because the victim was 20 years old at the time of trial. As in this case, the victim had not disclosed the assaults until many years

later. **Id.** at 1106. Vucich objected, but the trial court admitted the photographs into evidence.

On appeal, **Vucich** argued that the photographs were irrelevant. **Id.** at 1109. This Court agreed. **Id.** at 1109-10. Because Vucich did not dispute that the victim was a child at the times when the abuse occurred, there was no need to prove to the jury what the victim looked like as a child, rendering the evidence irrelevant and thus, inadmissible. **Id.**

The facts here are identical to **Vucich**. Under the factual circumstances "where photographs were displayed for no purpose other than establishing the victim's appearance at the time of the crimes," such photographs are inadmissible. [2] **Id**. at 1111. Thus, we conclude that the trial court abused its discretion when it admitted the photograph of D.S. into evidence.

However, as in **Vucich**, we conclude that the trial court's error was harmless. In **Vucich**, this Court ultimately concluded that any prejudice was *de minimis* and the error was harmless because the photographs were referenced briefly, and the Commonwealth did not revisit or otherwise draw attention to the photographs following their introduction. **Id.** at 1110.

Here, the Commonwealth did not unduly reference the photograph after its admission. Further, as the trial court observed, the evidence of Hofmann's guilt was overwhelming—D.S. credibly testified to the assaults, which occurred

---

[2] As in **Vucich**, we do not hold that the appearance of a child victim is *per se* irrelevant. **Commonwealth v. Vucich**, 194 A.3d 1103, 1111 (Pa. Super. 2018).

over many years, in detail, and Hofmann himself admitted to the crimes on multiple occasions prior to trial. Any prejudicial effect was *de minimis* and did not affect the outcome of the trial. Thus, Hofmann's first issue fails.

**B.**

Hofmann next claims that the trial court erred in permitting Detective Gorman to testify about why consensual interceptions of phone calls are used by police. Specifically, Hofmann argues Detective Gorman's testimony that this process is "used to get to the truth," improperly bolstered D.S.' credibility. Hofmann's Brief at 12, 40. He further maintains that the curative instruction given by the trial court was inadequate because the court merely reiterated the detective's statement. *Id.* at 41-42.

At trial, Detective Gorman testified regarding the purpose of consensual interceptions, and noted that "[t]he number one reason" to use such interceptions is "to get to the truth of the matter . . . ." N.T., 12/17/21, at 138. The court overruled Hofmann's objection, and Detective Gorman continued: "[w]e want to have the person call another person and talk on the phone. And when they usually talk to this person on the phone, the two people are talking whether they did something together or they know something, they're usually truthful with each other." *Id.* at 138-139.

A side bar followed. The trial court indicated that it understood the objection and that it would give a curative instruction. Defense counsel agreed. Thereafter, the court told the jury:

I just wanted to comment that at one point Detective Gorman indicated that the police conduct—intercept phone calls and such to get to, quote/unquote, [the] truth of the matter. And I just want you folks to realize what I've said to you I think three times in my earlier instructions. You folks are the ones who decide what the truth of the matter is. That's an expression that the detective used for purposes of explaining to you why he does what he does. But I just want to emphasize that you folks will be the determiners of what the truth is.

*Id.* at 155-56. The Commonwealth then continued its examination of Detective Gorman.

As the Commonwealth observes, this issue is waived. After objecting, defense counsel agreed to the curative instruction. Furthermore, after the instruction was given, Hoffman did not object or ask for additional instructions. Where a party does not object to the trial court's curative instruction at the time it is given, the curative instruction is presumed to be satisfactory, presumed to cure any prejudice, and the jury is presumed to follow the court's instructions. ***Tabernacle Church v. Edwin l. Mount Olivet Wiegand Div.***, 781 A.2d 1263, 1275 n.12 (Pa. Super. 2001), *aff'd without op.*, 811 A.2d 565 (Pa. 2002) (stating that failure to object indicates that the party "is satisfied with the curative instruction and that any prejudice is cured" because the jury is presumed to follow the court's instruction). And, as such, any claim in relation to the adequacy of the instruction is waived. ***See Commonwealth***

***v. Page***, 965 A.2d 1212, 1222 (Pa. Super. 2009).  Thus, Hofmann waived any objection that the curative instruction was inadequate.[3]

## C.

In his third issue, Hofmann challenges the trial court's sexually violent predator ("SVP") determination on the basis that there was insufficient evidence to establish his SVP designation by clear and convincing evidence. Specifically, Hofmann argues that the evidence did not show that he had an increased likelihood of reoffending.  Hoffman further maintains the expert found that several factors used to assess SVP status did not apply in his case. Therefore, according to Hofmann, the Commonwealth did not satisfy its burden in establishing that he was an SVP.  Hofmann's Brief at 11, 31, 33.

In considering an appeal of an SVP determination, our standard of review is *de novo* and our scope of review is plenary.  ***Commonwealth v. Meals***, 912 A.2d 213, 218 (Pa. 2006).

> The determination of a defendant's SVP status may only be made
> following an assessment by the [SOAB] and [a] hearing before the
> trial court. In order to affirm an SVP designation, we, as a
> reviewing court, must be able to conclude that the fact-finder
> found clear and convincing evidence that the individual is a
> sexually violent predator.  As with any sufficiency of the evidence
> claim, we view all evidence and reasonable inferences therefrom
> in the light most favorable to the Commonwealth as the prevailing

_____

[3] Even if the objection was not waived and the testimony was admitted erroneously, the error was harmless. As discussed above the evidence of Hofmann's guilt was significant.  This brief statement was unlikely to have contributed to the guilty verdict compared to all the other testimony and evidence.

party on this issue. We will reverse a trial court's determination of SVP status only if the Commonwealth has not presented clear and convincing evidence that each element of the statute has been satisfied.

*Commonwealth v. Fuentes*, 991 A.2d 935, 941-942 (Pa. Super. 2010) (*en banc*) (citation omitted), *appeal denied*, 12 A.3d 370 (Pa. 2010). The clear and convincing standard governing a determination of SVP status "requires evidence that is so clear, direct, weighty, and convincing as to enable the [trier of fact] to come to a clear conviction, without hesitancy, of the truth of the precise facts in issue." *Meals*, 912 A.2d at 219 (citations omitted, original brackets).

Section 9799.12 of the Sex Offender Registration and Notification Act ("SORNA") defines the term SVP as:

> [a]n individual who committed a sexually violent offense on or after December 20, 2012, for which the individual was convicted, [ ] who is determined to be a [SVP] under section 9799.24 (relating to assessments) due to a mental abnormality or personality disorder that makes the individual likely to engage in predatory sexually violent offenses.

42 Pa.C.S.A. § 9799.12; *see also Commonwealth v. Butler*, 226 A.3d 972, 992 (Pa. 2020) (stating, an SVP, in addition to having been convicted of a sexually violent offense, is a person "who [has] been individually determined to suffer from a mental abnormality or personality disorder such that they are highly likely to continue to commit sexually violent offenses").

A "sexually violent offense" is defined by SORNA as "[a]n offense specified in section 9799.14 (relating to sexual offenses and tier system) as a

Tier I, Tier II[,] or Tier III sexual offense committed on or after December 20, 2012, for which the individual was convicted." 42 Pa.C.S.A. § 9799.12. "Predatory" is defined by SORNA as "[a]n act directed at a stranger or at a person with whom a relationship has been initiated, established, maintained or promoted, in whole or in part, in order to facilitate or support victimization."

*Id.*

Under Section 9799.24 of SORNA, after a defendant is convicted of a sexually violent offense but before sentencing, the trial court shall order the SOAB to conduct an "assessment of the individual to determine if the individual should be classified as [an SVP]." 42 Pa.C.S.A. § 9799.24(a) and (b). In performing its assessment, the SOAB examines, *inter alia* the following:

> (1) Facts of the current offense, including:
>
>> (i) Whether the offense involved multiple victims.
>>
>> (ii) Whether the individual exceeded the means necessary to achieve the offense.
>>
>> (iii) The nature of the sexual contact with the victim.
>>
>> (iv) Relationship of the individual to the victim.
>>
>> (v) Age of the victim.
>>
>> (vi) Whether the offense included a display of unusual cruelty by the individual during the commission of the crime.
>>
>> (vii) The mental capacity of the victim.
>
> (2) Prior offense history, including:
>
>> (i) The individual's prior criminal record.
>>
>> (ii) Whether the individual completed any prior sentences.

(iii) Whether the individual participated in available programs for sexual offenders.

(3) Characteristics of the individual, including:

(i) Age.

(ii) Use of illegal drugs.

(iii) Any mental illness, mental disability or mental abnormality.

(iv) Behavioral characteristics that contribute to the individual's conduct.

(4) Factors that are supported in a sexual offender assessment field as criteria reasonably related to the risk of reoffense.

42 Pa.C.S.A. § 9799.24(b) (1-4).

This Court further summarized:

The precise line of inquiry for the [SOAB's] expert, as well as any other expert who testifies at an SVP hearing, is whether the defendant satisfied the definition of sexually violent predator set out in the statute, that is, whether he or she suffers from a mental abnormality or personality disorder that makes him or her more likely to engage in predatory sexually violent offenses. The salient inquiry to be made by the trial court is the identification of the *impetus* behind the commission of the crime and extent to which the offender is likely to *reoffend.*

*Fuentes*, 991 A.2d at 943.

Here, Hofmann committed multiple sexually violent offenses and was convicted. At the SVP hearing, Dr. Stein testified that he diagnosed Hofmann with pedophilic disorder and that there was overwhelming evidence for this disorder. Dr. Stein also diagnosed Hofmann with specified paraphilic disorder: non-consent. Dr. Stein further stated that Hofmann demonstrated predatory behavior. He explained:

- 15 -

>With the first molestation of this child, the relationship was established that at least in part was victimizing that child. With many assaults over a 10 to 12-year period, the relationship was established and maintained and promoted, in whole or in part, in order to support or facilitate sexual victimization. There is overwhelming evidence for predatory behavior as the statute defines it.

N.T., 4/25/22, at 16-17, 19. As a result, Dr. Stein opined that Hofmann met the SVP criteria. Based upon Dr. Stein's testimony, the trial court determined that Hofmann was an SVP.

Upon review of the record and viewing the evidence in the light most favorable to the Commonwealth, we agree that the Commonwealth established that Hofmann satisfied the statutory definition of an SVP by clear and convincing evidence. We reach this conclusion despite Hofmann's claims.

We acknowledge that the definition of SVP includes an inquiry into the likelihood of reoffense. However, contrary to Hofmann's argument, the risk of reoffense is not an independent element of the SVP classification. Instead, the risk of reoffense is but one factor to be considered when making an SVP assessment. *Commonwealth v. Morgan*, 16 A.3d 1165 (Pa. Super. 2011). The statute requires "an inquiry into the likelihood of reoffense," it does not require an "assessment of the likelihood of reoffense," or "personal risk assessment." *Morgan*, 16 A.3d at 1170, 1173 (quoting *Commonwealth v. Dixon*, 907 A.2d 533, 539 (Pa. Super. 2006) and *Commonwealth v. Geiter*, 929 A.2d 648, 651 (Pa. Super. 2007)). Thus, the Commonwealth must show that the defendant has a mental disorder that makes him more likely to

engage in predatory sexually violent offenses--that the person suffers from a condition that makes him likely to reoffend. ***Morgan***, 16 A.3d at 1171.

Clearly, this inquiry was made here. Moreover, the evidence demonstrated that Hofmann suffered from two mental abnormalities or personality disorders and was likely to reoffend. As the trial court noted:

> Pedophilic Disorder (or pedophilia) has been recognized by the courts of this Commonwealth for years as a condition in which the afflicted bears an extreme risk of predatory sexually violent offenses. ***See Commonwealth v. Meals***, 912 A.2d 213 (Pa. 2006); **Commonwealth v. Geiter**, 929 A.2d 648, 653 (Pa. Super. Ct. 2007) (concurring opinion of Judge Klein) ("all pedophiles are likely to engage in predatory sexually violent offenses in the future"); ***Commonwealth v. Leddington***, 908 A.2d 328, 332 n.9 (Pa. Super. Ct. 2006) ("The inherent and apt assumption in [our Supreme Court's] statement is that pedophilia is always a risk to the community--even if there is only a .0001 chance a pedophile will recidivate.").

Trial Court Opinion, 1/20/23, at 18.

The trial court also observed:

> Dr. Stein testified that [Hofmann's] behavior pattern demonstrates his interest in the victimization of another through non-consenting sexual acts, particularly the fact that [Hofmann] victimized a child past the prepubescent years and into the postpubescent years.

> Dr. Stein testified that both Pedophilic Disorder and Other Specified Paraphilic Disorder: Non-Consent are acquired, uncurable, lifetime conditions. Further, [Hofmann's] repeated inability to resist the urge to commit sexual offenses demonstrates that either he decided to not control them or was incapable of doing so — meaning the conditions overrode his emotional or volitional controls. Further, based on the extreme length of [Hofmann's] abuse of D.S. and the fact that the offenses involved a male victim, Dr. Stein concluded that should [Hofmann] have

unsupervised access to underage or young boys, he would reoffend.

*Id.* at 18 (citations omitted). Furthermore, Dr. Stein testified that Hofmann's conditions were the impetus behind his conduct. Thus, the relevant inquiry required by the statute was made, and in fact, the evidence demonstrated that Hofmann was likely to reoffend.

As to Hoffmann's argument that all the various assessment factors listed in Section 9795.4 were not present, we observe that there is no statutory requirement that all the factors or any particular number of them be present or absent in order to support an SVP designation. ***Commonwealth v. Feucht***, 955 A.2d 377, 381 (Pa. Super. 2008). The assessment factors are not a checklist with each one weighing in some necessary fashion for or against SVP designation. ***Id.*** Rather, the presence or absence of one or more factors might simply suggest the presence or absence of one or more particular types of mental abnormalities. ***Id.***

Here, Dr. Stein determined that the following statutory factors contributed to Hofmann's diagnoses: the nature of the sexual contact, Hofmann's relationship to the victim, the ages of the victim and Hofmann, and the behaviors contributing to Hoffman's conduct. N.T., 4/25/22, at 13-17, 20. Dr. Stein noted that it would be rare for someone to meet all or even most of the fifteen factors evaluated by the SOAB. Instead, those factors are reviewed to consider issues of predatory behavior and mental abnormality. ***Id.*** at 13.

Thus, as discussed above, despite the absence of certain factors, Dr. Stein opined that Hofmann met the SVP criteria.

We conclude that the trial court did not err in determining that the Commonwealth presented clear and convincing evidence that supports a finding that Hofmann was an SVP. Accordingly, Hofmann's claim has no merit.

**D.**

In his fourth and final issue, Hofmann challenges the discretionary aspects of his sentence. "It is well settled that, with regard to the discretionary aspects of sentencing, there is no automatic right to appeal." *Commonwealth v. Austin*, 66 A.3d 798, 807-08 (Pa. Super. 2013) (citation omitted). This Court has explained that, to reach the merits of a discretionary sentencing issue, we must conduct a four-part analysis of the following factors:

> (1) whether the appeal is timely; (2) whether [a]ppellant preserved his issue; (3) whether [a]ppellant's brief includes a concise statement of the reasons relied upon for allowance of appeal with respect to the discretionary aspects of sentence [in accordance with 2119(f)]; and (4) whether the concise statement raises a substantial question that the sentence is appropriate under the sentencing code. . . . [I]f the appeal satisfies each of these four requirements, we will then proceed to decide the substantive merits of the case.

*Commonwealth v. Colon*, 102 A.3d 1033, 1042–43 (Pa. Super. 2014) (quoting *Austin*, 66 A.3d at 808).

Here, Hofmann satisfied the first and third requirements under **Colon**. Accordingly, we must determine whether he preserved his issues and raised a substantial question in accordance with the second and fourth requirements.

In his Rule 2119(f) statement, Hofmann sets forth several reasons why he should be permitted to appeal the discretionary aspects of his sentence. Hofmann claims that the trial court abused its discretion by: 1) imposing a manifestly excessive and unreasonable sentence, 2) sentencing him above the aggravated range without stating its reasons on the record; 3) failing to consider mitigating factors and his rehabilitative needs, and 4) relying on improper factors to determine his sentence, *i.e.*, that Hofmann exercised his right to a jury trial and suggesting that he likely abused other children after D.S. but was not caught. Hofmann's Brief at 14, 15.

Upon review of the record, we observe that Hofmann did not preserve his argument regarding the court's failure to state on the record the reasons for imposing a sentence above the aggravated range. This issue was not raised with the trial court. We therefore will not consider this sentencing claim.

However, Hofmann preserved the remaining claims, and they raise a substantial question. **See Commonwealth v. Caldwell**, 117 A.3d 763, 770 (Pa. Super. 2015) (*en banc*) (citing **Commonwealth v. Raven**, 97 A.3d 1244, 1253 (Pa. Super. 2014), *appeal denied*, 105 A.3d 736 (2014) (stating that "an excessive sentence claim—in conjunction with an assertion that the court failed to consider mitigating factors—raises a substantial question")) (internal

citation omitted); ***Commonwealth v. Ali***, 197 A.3d 742, 760 (Pa. Super. 2018) (recognizing claim that sentencing court relied on impermissible factors raises a substantial question). We therefore will address the merits of Hofmann's remaining issues.

Our standard of review of a sentencing claim is as follows:

Sentencing is a matter vested in the sound discretion of the sentencing judge, and a sentence will not be disturbed on appeal absent a manifest abuse of discretion. In this context, an abuse of discretion is not shown merely by an error in judgment. Rather, the appellant must establish, by reference to the record, that the sentencing court ignored or misapplied the law, exercised its judgment for reasons of partiality, prejudice, bias or ill will, or arrived at a manifestly unreasonable decision.

***Commonwealth v. Shugars***, 895 A.2d 1270, 1275 (Pa. Super. 2006).

Hofmann first claims that the trial court imposed an excessive sentence and did not consider various mitigating factors, in particular his age and family history, or his rehabilitative needs. Hofmann's Brief at 13.

Upon review of the record, we first note that the trial court had two psychological evaluations. These reports detailed Hofmann's history and background, character, and condition. Before sentencing Hofmann, the court reviewed these reports. And the court specifically acknowledged that they contained evidence of mitigation. N.T., 4/25/22, at 96. In fact, in its opinion, the trial court highlighted each mitigating factor it considered with specific reference to the record. It noted:

This [c]ourt considered [Hofmann's] age and health. This [c]ourt considered [Hofmann's] lack of a criminal record — as do the Sentencing Guidelines themselves. This [c]ourt noted that it is

- 21 -

difficult to credit Hofmann for his lack of a criminal record when considering 12 to 13 years of ongoing, substantial sexual abuse of a child. Hofmann's mental health issues were considered in imposing [s]entence. His upbringing was considered. Hofmann's good conduct in jail — although of limited value when compared to his offenses — was considered. The [c]ourt considered the impact of consecutive maximum sentences based on Hofmann's age and as it noted then, and reemphasizes yet again, that the fact that [Hofmann] had nearly 15 years of freedom after D.S. escaped his abuse is not the fault of this [c]ourt. As this [c]ourt explained, the fact that [Hofmann] faces such a significant sentence at an advanced age is solely due to [his] own actions.

Trial Court Opinion, 1/20/23, at 37 (citations to record omitted). Thus, the trial court clearly considered Hofmann's mitigating factors and his rehabilitative needs.

Nonetheless, considering the length, severity of the abuse, and numerous instances of abuse in this case, the trial court found that a sentence above the aggravated range was warranted. The court explained:

[Hofmann] preyed on the victim in this matter for more than a decade commencing when the victim was approximately 5 years old and engaged in hundreds and hundreds of sexual assaults upon this young man.

[Hofmann] engaged in significant predatory behavior of grooming this young man over a period of time, by purchasing him gifts and creating a relationship with the victim's family in which he could carry out his criminal assaults.

The evidence in the case is overwhelming including the 100% credible and truthful testimony of the victim and two taped confessions from [Hofmann], one on video, and one via audio, and despite this overwhelming evidence, [he] would not accept responsibility for his actions and instead required the victim to re-live these assaults in front of a jury. [Hofmann] has expressed no remorse, nor any understanding of the enormity of what he perpetrated upon this young man and its effect.

- 22 -

Lastly, for all the reasons indicated in the record, including the need for protecting the public from [Hofmann] and the volume of crimes he engaged in, this [c]ourt has determined that imposing [s]entences only in the guidelines range would not adequately address the purposes and goals of our Sentencing Code, nor serve the interests of Justice.

N.T., 04/25/22, 98-99. Thus, it is evident that the court considered all relevant factors when it sentenced Hofmann. On appeal, "[w]e cannot re-weigh the sentencing factors and impose our judgment in place of the sentencing court." *Commonwealth v. Macias*, 968 A.2d 773, 778 (Pa. Super. 2009).

Additionally, Hoffman claims that the trial court impermissibly considered that he exercised his right to a jury trial rather than plead guilty when it sentenced him. Hofmann argues that the court repeatedly commented about this before issuing Hofmann's sentence. Hofmann's Brief at 21-22.

"[I]t is constitutionally impermissible for a trial court to impose a more severe sentence because a defendant has chosen to stand trial rather than plead guilty." *Commonwealth v. Bethea*, 379 A.2d 102, 105 (Pa. 1977). Thus, we must review whether the sentencing court relied on the defendant's exercise of his right to trial, even if the court also considered other, permissible factors. *Id.*

In deciding whether a trial judge considered only permissible factors in sentencing a defendant, an appellate court must, of necessity, review all the judge's comments. Moreover, in making this determination it is not necessary that an appellate court be convinced that the trial judge in fact relied upon an erroneous consideration; it is sufficient to render a sentence invalid if it

reasonably appears from the record that the trial court relied in whole or in part upon such a factor.

Id. at 106–07.

We make this determination presuming that a sentencing court is able to disregard irrelevant evidence, such as an impermissible sentencing factor. *Commonwealth v. Smithton*, 631 A.2d 1053, 1057 (Pa. Super. 1993) (citing *Bethea*, 379 A.2d at 107). Further, we note that it is well-settled that defendants who plead guilty and those who proceed to trial are not similarly situated for sentencing purposes; therefore, a comparatively harsher sentence does not demonstrate punishment for exercising constitutional rights. *Ali*, 197 A.3d at 764 (citing *Moury*, 992 A.2d at 171).

Here, based upon our review of the record, we observe that the trial court referenced the fact that Hofmann did not plead guilty and refused to accept responsibility. However, reading the sentencing transcript in its entirety, it does not appear that the court relied on this fact in fashioning Hofmann's sentence. N.T., 4/25/22, at 88-93; *cf. Moury*, 992 A.2d at 172–74 (finding no error from a colloquy about why a defendant went to trial). Instead, the trial court explained that these comments were made while addressing D.S. about what he had been subjected to and were intended to temper the repeated instances of victim blaming that Hofmann and his family engaged in. Trial Court Opinion, 1/20/23, at 37, 39-40

Hofmann also claims that the trial court improperly considered the possibility that, despite the lack of a criminal record, Hofmann had abused other children after he stopped abusing D.S. Hofmann's Brief at 22-23.

Our review of the record discloses that the court questioned the possibility of Hofmann abusing others. However, the court noted that it did not know if Hofmann did such acts and emphasized that it only sentenced Hofmann on what was before the court *i.e.*, more than a decade of sexual abuse of one young boy. N.T., 4/25/22, at 90. Again, we conclude that although the court made these comments, the record does not indicate that the court relied on this when it sentenced Hofmann.

Based upon our review of this case and the sentencing transcript, we conclude that, contrary to Hofmann's allegations, it is evident that the trial court considered all the sentencing factors, including the mitigating circumstances of and Hofmann's rehabilitative needs and did not rely on impermissible factors when it sentenced Hofmann. We therefore conclude that the court did not abuse its discretion when it sentenced Hofmann.

Judgment of sentence affirmed.

*Judgment Entered.*

*Joseph D. Seletyn, Esq.*
*Prothonotary*

*Date: 9/21/2023*